lml

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-40116-JAR |
| | ) | |
| JORGE M. CANO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER DENYING MOTION TO SUPPRESS

Defendant Jorge Cano is charged with one Count of possession with intent to distribute approximately seventeen kilograms of cocaine. This matter is before the Court on defendant's Motion to Suppress (Doc. 11) the cocaine and other materials seized during the stop and subsequent search of his vehicle. The government has responded (Doc. 33) and an evidentiary hearing was held on August 15, 2006. After considering the evidence and submissions of the parties, the Court is prepared to rule. For the reasons explained in detail below, the Court denies defendant's motion.

## I.    Factual Background

At approximately 2:45 pm on October 18, 2005, Kansas Highway Patrol Trooper Andrew Dean saw a blue Town & Country minivan traveling east on I-70 in Wabaunsee County, Kansas. Trooper Dean observed in his rear-view mirror that the van had a Kentucky dealer's license plate, number X2070A, properly displayed on the rear bumper of the vehicle. Dean checked the license plate number with a Highway Patrol dispatcher and verified that it was valid and registered in the name of Eagle Auto Sales, a car dealership in Kentucky, later determined to be

owned by defendant.

As Trooper Dean turned around and followed the van, he noticed what he thought was a temporary license displayed in the rear window of the van. Part of the license was blocked by the rear brake light in the center of the rear window. The dark tint of the rear window also contributed to Trooper Dean's inability to make out what was displayed in the rear window. The video recording of Dean's stop of the van shows that the temporary license was, in fact, almost impossible to see.

Trooper Dean stopped the van. The driver was Maria Cano, defendant's wife; defendant was the passenger. Trooper Dean approached the passenger side window of the van and told the occupants why he stopped them: "As you can tell I saw a tag in the back window and I noticed you have a dealer tag so I wanted to check on both of them." After approaching the van and obtaining licenses and registration, Trooper Dean engaged in the following questioning:

| | |
|---|---|
| Trooper: | Where are you guys coming from? |
| Cano: | (inaudible) |
| Trooper: | Oh, are you? Where's that at? |
| Cano: | (Inaudible) . . . Denver. |
| Trooper: | Where are you going now? |
| Cano: | Going to Kentucky, to my dealership. |
| Trooper: | Are you? (Inaudible) |
| Cano: | (Inaudible) |
| Trooper: | Oh, okay, that's fine. |
| | Just a, did you guys just drive out there and . . . |
| Cano: | Yeah. (inaudible) |
| Trooper: | Did you? Okay. Just so you know, you can't be displaying two tags like that. |
| Cano: | I can take one . . . |
| Trooper: | No, that's, don't worry about it right now. |
| Cano: | This is my personal . . . |
| Trooper: | Oh, this is your personal van? Okay, you just (inaudible) something? |
| Cano: | Yeah, (inaudible) |
| Trooper: | Oh, okay. |

2

| Cano: | (Inaudible) . . . buy used car but I don't like to buy used car from (inaudible). |
| Trooper: | Yeah. |
| Cano: | (Inaudible) |
| Trooper: | Oh, is it? |
| Cano: | (Inaudible) |
| Trooper: | You have to get it renewed? |
| Cano: | (Inaudible) |
| Trooper: | You have quite a few (inaudible)? |
| Cano: | (Inaudible) |
| Trooper: | Where do you live now? |
| Cano: | Um, we live over there (inaudible) |
| Trooper: | Oh, in L.A.?  Okay. |
|  | You guys stay here in the car and I will be back in just a minute, okay? |

The questioning took approximately ninety seconds.  The van was owned and insured by defendant.  Mrs. Cano was driving on an expired license.  Defendant's license was issued in California.

Trooper Dean went to his patrol car, then returned to the van after approximately seven minutes.  Trooper Dean returned all documents to the Canos and issued a warning ticket to Mrs. Cano for "improperly displaying an expired temporary registration," in violation of K.S.A. § 8-133.  Trooper Dean told Mrs. Cano to get her license renewed and suggested that defendant take over driving.  He then told the Canos to "have a good one," and stepped back from the van.  Defendant exited the van to switch seats with Mrs. Cano.  Trooper Dean then asked defendant if he could ask him additional questions, mentioned a problem with drugs and guns coming from Denver, and asked if there were drugs or guns in the van.  Trooper Dean then asked: "You mind if I take a look?  Would that be okay?"  Defendant responded: "No.  You can check."

Trooper Dean and his back-up began searching the van.  They started in the rear of the van, opening what Trooper Dean referred to as the "back gate," the door in the back of the van

that opens from the bottom and swings up, becoming parallel to the road.  After spending about fifteen seconds looking at the luggage in the back of the van, Trooper Dean saw what he described as three to four inches of weather-stripping that was "curled under the interior panel on the left side."  He pried back the panel and pulled on it to break the clamps holding it to the body of the van.  He succeeded and was able to peer behind the panel, and saw what he believed to be "several packages of drugs."  Defendant was arrested and this motion followed.

## II.    Analysis

### A.    Initial Stop

"'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'"[1]  The principles of *Terry v. Ohio*[2] apply to such traffic stops.  Thus, the reasonableness of a stop depends on (1) whether "'the officer's action was justified at its inception,'" and (2) whether it "'was reasonably related in scope to the circumstances which justified the interference in the first place.'"[3]  Tenth Circuit cases establish that "a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile."[4]  Reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if

---

[1]*United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)).

[2]392 U.S. 1 (1968).

[3]*United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc) (quoting *Terry*, 392 U.S. at 20).

[4]*United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993).

premised on factual error.[5]  Unless the officer has an objectively reasonable suspicion that illegal activity unrelated to the stop has occurred or the driver otherwise consents to the encounter, the resulting detention is reasonable only so long as the officer's subsequent conduct is reasonably related in scope to the circumstances that justified the initial stop.[6]  "In other words, once the purpose of the stop is satisfied and any underlying reasonable suspicion dispelled, the driver's detention generally must end without undue delay."[7]

Defendant first challenges the initial stop of his vehicle, arguing that since the dealer tag on the back of the van was correctly displayed, it was not a violation for defendant to also display an expired temporary tag in the rear window.  The government responds that it is a violation for a driver to display more than one tag on a vehicle and that the temporary tag was displayed improperly due to its positioning behind the brake light, which obscured the numbers. To uphold the stop, the Court must conclude that Trooper Dean, based upon the facts known to him, possessed reasonable suspicion of legal wrongdoing, that is, a particularized and objective basis for believing defendant had violated some law.[8]  "While something more than a 'hunch' of wrongdoing is necessary, the level of suspicion required to support a traffic stop is 'considerably less' than proof of wrongdoing by a preponderance of the evidence."[9]

The Tenth Circuit has been confronted with a series of cases concerning traffic stops

---

[5]*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

[6]*United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005).

[7]*United States v. Edgerton*, 438 F.3d 1043 1047 (10th Cir. 2006) (citing *United States v. Millan-Diaz*, 975 F.2d 720, 721-22 (10th Cir. 1992)).

[8]*Williams*, 403 F.3d at 1207.

[9]*Edgerton*, 438 F.3d at 1047 (quoting *United States v. Dennison*, 410 F.3d 1203, 1207-08 (10th Cir. 2005)).

based on issues centering on temporary registration tags.  In *United States v. McSwain*,[10] a Utah state trooper stopped the defendant's vehicle "for the sole purpose of ensuring the validity of the vehicle's temporary registration sticker."[11]  The trooper found the registration tag difficult to read because the expiration date appeared to be covered with reflective tape.[12]  As the trooper approached the vehicle on foot, he verified that the registration tag was valid and current, and observed no violation of state law.[13]  The Tenth Circuit held that the trooper's decision to prolong the detention by requesting license and registration information and questioning the driver "exceeded the scope of the stop's underlying justification" and thus violated the Fourth Amendment.[14]

In *United States v. DeGasso*,[15] an Oklahoma state trooper stopped a truck after observing that its rear license plate was mounted too low, obscuring the lettering at the bottom of the tag. An Oklahoma statute required all license plates to be "clearly visible at all times,"[16] and the Tenth Circuit predicted that Oklahoma courts would construe that requirement to apply equally to out-of-state drivers.[17]  The court found the case was "easily distinguishable" from *McSwain*:

> In *McSwain*, the traffic stop was made in order to determine
> whether a temporary registration sticker was valid; there was no

---

[10]29 F.3d 558 (10th Cir. 1994).

[11]*Id.* at 561.

[12]*Id.* at 560.

[13]*Id.*

[14]*Id.* at 561.

[15]369 F.3d 1139, 1141 (10th Cir. 2004).

[16]Okla. Stat. tit. 47, § 1113.A.2.

[17]*DeGasso*, 369 F.3d at 1147.

> requirement that it be visible or unobscured.  In that case, when the
> officer approached the vehicle and found that the sticker was valid,
> the purpose of the stop was over.  In this case, the violation was
> that the lettering on the license plate was not 'clearly visible,'
> which remained true even after the trooper approached the truck
> and was able, at that point, to read it.[18]

Since defendant filed his motion to suppress on January 3, 2006, the Tenth Circuit has issued two decisions clarifying these issues.  In *United States v. Edgerton*,[19] the court decided the constitutionality based on K.S.A. § 8-133, the same statute at issue in this case.  Kansas law requires that "[e]very license plate shall at all times be securely fastened to the vehicle . . . in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible."[20]  Trooper Dean, the same trooper in this case, spotted a vehicle from Colorado on I-70 at 2:30 a.m.[21]  He could not read the vehicle's temporary registration tag, posted in the rear window as required by Colorado law, because "it was dark out,"and not because of any obstruction.[22]  After approaching the vehicle on foot, Trooper Dean had no difficulty reading the tag and noted that it appeared valid.[23]  Trooper Dean proceeded to inspect the undercarriage of the vehicle, issued a warning for a violation of § 8-133, questioned the driver, and requested and received consent to search the trunk.[24]

---

[18]*Id.* at 1149.

[19]438 F.3d 1043 (10th Cir. 2006).

[20]K.S.A. § 8-133.

[21]*Edgerton*, 438 F.3d at 1045.

[22]*Id.*

[23]*Id.*

[24]*Id.* at 1045-46.

The Tenth Circuit held that Trooper Dean's initial stop of the vehicle to ascertain its identity constituted a permissible investigative detention of limited scope consistent with the Fourth Amendment.[25]   The court went on to conclude, however, that Trooper Dean's actions exceeded the permissible scope of the detention in light of the underlying justification.[26]  In reversing the district court, the Tenth Circuit concluded that § 8-133 does not criminalize a "wholly unremarkable" temporary registration tag simply because a vehicle is traveling at night.[27]  "Once Trooper Dean was able to read the temporary tag and deem it unremarkable, any suspicion that Defendant had violated § 8-133 dissipated because the tag was 'in a place and position to be clearly visible.'"[28] At that point, the court found that *McSwain* instructed that the trooper should have explained the reason for the initial stop and then allow defendant to leave without requiring her to produce her license and registration.[29]

In *United States v. Ledesma*,[30] the van driven by the defendant had dark, tinted windows that made it nearly impossible for the trooper to make out the numbers on the temporary registration, even as he approached the van on foot.  The trooper could not read the name of the state that issued the tag, nor could he determine whether the numbers were an expiration date.[31]

---

[25]*Id*. at 1048.

[26]*Id*. at 1051.

[27]*Id*.

[28]*Id*.

[29]*Id*. (citing *McSwain*, 29 F.3d 558, 562 (10th Cir. 1994)).  In so ruling, the court recognized that in similar circumstances, the "brief encounter" between the trooper and driver might independently give rise to facts creating reasonable suspicion of criminal activity that warrant further investigation.  *Id*. The district court made no such finding, however, and the government did not raise the argument on appeal. *Id*.

[30]447 F.3d 1307, 1313 (10th Cir. 2006).

[31]*Id*.

8

The court found that the trooper thus observed a "straightforward violation" of § 8-133 because the defendant displayed her temporary tag behind a tinted window that rendered it nearly illegible.[32]  Unlike *Edgerton*, the extended detention of the defendant in *Ledesma* did not violate the Fourth Amendment because the trooper saw that defendant's registration tag was displayed in an unlawful manner "even after [he] approached the [vehicle] and was able, at that point, to read it."[33]  Thus, the court concluded it was reasonable under the circumstances for the trooper to issue a written warning, verify the defendant's license and registration information, and ask preliminary questions about travel plans.[34]

In this case, Trooper Dean testified that he observed what he thought was a temporary tag displayed in the tinted rear window of the van.  He could not read the numbers on the tag from his patrol car, even though it was daylight.  Trooper Dean testified that he thought it was illegal to display both tags and that two tags, one a dealer tag, indicated possible illegal activity.  Thus, Trooper Dean's initial stop of defendant's van to check the temporary tag was a permissible investigative detention of limited scope consistent with the Fourth Amendment.  "Certainly, a vehicle's apparent failure to display some form of visible license plate/registration tag, temporary or permanent, gives rise to a reasonable suspicion that its driver might be violating any one of the multitude of applicable traffic and equipment regulations of the jurisdiction."[35]

Defendant argues that this case is distinguishable from those where vehicle stops were

---

[32]*Id.*

[33]*Id.* at 1314 (citing *DeGasso*, 369 F.3d at 1149).

[34]*Id.* (citations omitted).

[35]*United States v. Edgerton*, 438 F.3d 1043, 1048 (10th Cir. 2006) (internal quotations omitted).

determined to be valid based on difficulty reading the temporary tag. Defendant argues, in essence, that so long as one regular tag is displayed, law enforcement must give the vehicle a "pass," and ignore both the existence and manner of display of a temporary tag. Here, Trooper Dean was able to read the dealer tag on defendant's van while following it at a safe distance. He called in the dealer tag number and was able to determine that the registration was valid and that the dealer's tag was registered to Eagle Auto Sales. Because Trooper Dean was able to read the dealer tag and check the registration, defendant urges that there was no violation of § 8-133 justifying his stop of the van.

The Court disagrees. As the government asserts, § 8-133 provides that the vehicle shall bear one current registration tag, unless the vehicle is an antique, or a personalized dual tag has been issued:

> The license plate assigned to the vehicle shall be attached to the rear thereof and shall be so displayed during the current registration year or years, and no Kansas registration plate for any other year shall appear on the front of the vehicle, except that: (1) The license plate issued for a truck tractor shall be attached to the front of the truck tractor; (b) a model year license plate may be attached to the front of an antique vehicle, in accordance with K.S.A. 8-172, and amendments thereto; or (c) a personalized license plate as authorized under subsection (c) of K.S.A. 8-132, an amendments thereto, may be attached to the front of a passenger vehicle or truck. Every license plate shall at all times be securely fastened to the vehicle to which it is assigned so as to prevent the plate from swinging, and at a height not less than 12 inches from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible. During any period in which the construction of license plates has been suspended pursuant to the provisions of K.S.A. 8-132, and amendments thereto, the plate, tag, token, marker or sign assigned to such vehicle shall be attached to and displayed on such vehicle in such place, position, manner and condition as shall be prescribed by the director of vehicles.

10

Moreover, K.S.A. § 8-136, the statute regarding dealer tags makes clear that only one tag shall be displayed on dealer vehicles, and that tag must be a dealer tag:

> Dealer license plates; manufacturers' and dealers' use and limitations on use; display; proof of payment of personal property tax before issuance; transportation of certain trailers.
> (a) A licensed manufacturer of or licensed dealer in vehicles demonstrating, displaying or exhibiting any such vehicle upon any highway in lieu of registering each such vehicle, may obtain from the division of vehicles, upon application therefor upon the proper official form, and payment of the fees required by law, and attach to such vehicle, **one license plate** which shall have a distinctive number, the name of this state, which may be abbreviated, and the year for which issued, together with the word "dealer" or a distinguishing symbol indicating that such license plate is issued to a manufacturer or dealer. (emphasis added)

Defendant's motion to suppress is denied on this issue.

**B.      Validity of Roadside Detention**

Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry*.[36]  "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[37]  The detention must be temporary and its scope must be carefully and narrowly tailored to its underlying justification.[38]  "Under ordinary circumstances, this limits the officer to a request for the driver's license and registration, a computer check on the car and driver, an inquiry about the driver's travel plans, and the issuance

---

[36]*United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000).

[37]*United States v. Cervine*, 347 F.3d 865, 870-71 (10th Cir. 2003) (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[38]*United States v. Gutierrez-Daniez*, 131 F.3d 939, 942 (10th Cir. 1997), *cert. denied,* 523 U.S. 1035 (1998); *United States v. Lindsey*, 288 F. Supp. 2d 1196, 1202 (D. Kan. 2003).

of a citation."[39]  Upon issuing the citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay or additional questioning.[40]

A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter.[41]  If the officer continues to question the driver in the absence of either of these two circumstances, then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms."[42]  But, if an encounter between a police officer and a motorist is consensual, the Fourth Amendment ban on unreasonable searches and seizures does not come into play.[43]

### Duration of Stop

Defendant claims that Trooper Dean unlawfully extended the duration of the stop and defendant's detention beyond its limited scope.  When he approached the van on foot, Trooper Dean observed that the temporary tag was partially obscured by the rear brake light and that he could not see the last number of the tag.  He also determined that the tag had expired.  Following *Ledesma*, the Court concludes that Trooper Dean observed a "straightforward" violation of § 8-

---

[39]*Cervine*, 347 F.3d at 871.

[40]*United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *Patten*, 183 F.3d at 1193.

[41]*Cervine*, 347 F.3d at 871.

[42]*United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997) (internal quotations and citations omitted).

[43]*See United States v. Walker*, 933 F.2d 812, 816-17 (10th Cir. 1991), *cert. denied*, 502 U.S. 1093 (1992).

133.[44]  It was therefore reasonable under the circumstances for Trooper Dean to verify the

Canos' license and registration information, run a computer check on the car and driver, ask

preliminary questions about travel plans, and issue a written warning or citation.[45]


### Scope of Questioning

Defendant also urges that pursuant to *United States v. Holt*,[46] Trooper Dean exceeded the

scope of a permissible traffic stop by asking defendant questions unrelated to the traffic stop,

namely questions regarding defendant's trip, his business, and where he lives, without any

reasonable suspicion that he was committing a crime.  In *Holt*, the Tenth Circuit held en banc

that an officer conducting a routine traffic stop may not ask questions unrelated to the purpose of

the stop, even if the questioning does not extend the normal length of the stop, unless the officer

has reasonable suspicion of illegal activity.[47]  The *Holt* decision did not alter the long-standing

rule that officers can ask about travel plans, as such questions typically fall within the scope of a

traffic stop—indeed, the Tenth Circuit reiterated that "[t]ravel plans typically are related to the

purpose of a traffic stop because the motorist is traveling at the time of the stop."[48]  Instead, *Holt*

stands for the proposition that a "traffic stop based on probable cause must be judged by

---

[44]*United States v. Ledesma*, 447 F.3d 1307, 1313 (10th Cir. 2006).

[45]*Id*. at 1314 (citing *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998); *United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996)).

[46]264 F.3d 1215 (10th Cir. 2001) (en banc).

[47]*Id*. at 1230.

[48]*Id*. at 1221; *United States v. Oliver*, 363 F.3d 1061, 1064 (10th Cir. 2004) (noting that "*Holt* allows the officer routinely to ask about travel plans . . . during a lawful traffic stop").

examining both the length of the detention and the manner in which it is carried out."[49]

As with the issues surrounding temporary license tags, the law on this issue continues to develop in this Circuit.  In *United States v. Oliver*,[50] the Tenth Circuit construed *Holt* to mean that non-detaining questions asked during a traffic stop are to be treated differently than questions that result in actual seizures.[51]  The standard by which to judge non-detaining questions is "whether the circumstances made it reasonable for the officer to ask the questions, even when the questioning did not prolong the detention."[52]  Thus, when a question does not result in a prolonged detention, an officer need not have reasonable suspicion, as that term is generally understood, for "a less-confined reasonableness standard is appropriate in this context."[53]  The defendant maintains that this section of the *Oliver* decision, is not good law, citing to the concurring opinion explaining that the majority's interpretation of *Holt* attempts to overrule an en banc decision.  To date, however, *Oliver* has not been overturned or clarified.[54]

In *United States v. Wallace*,[55] the Tenth Circuit addressed a challenge to the scope of an officer's questions during a routine traffic stop.  While the officer and Wallace waited in the officer's patrol car for a confirmation of Wallace's driver's license, the officer asked him about

---

[49]*Id*. at 1230.

[50]363 F.3d 1061 (10th Cir. 2004).

[51]*Id*. at 1067.

[52]*Id*.

[53]*Id*. at 1067-68.

[54]As defendant also points out, this Court applied the *Oliver* standard in *United States v. Flores-Ocampo*, No. 04-40120-JAR, 2005 WL 466209 (D. Kan. Feb. 21, 2005).  The Tenth Circuit affirmed that decision without addressing *Oliver*, 172 Fed. App'x 688, (10th Cir. 2006).

[55]429 F.3d 969 (10th Cir. 2005).

14

his travel plans, employment, and the contents of a trailer that he was hauling, later discovered to contain contraband.[56]  On appeal, Wallace argued that several of the trooper's questions were intrusive and beyond the scope of the traffic stop.[57]  Relying on the Supreme Court's decision in *Muehler v. Mena*,[58] for the proposition that "mere police questioning does not constitute a seizure under the Fourth Amendment," the Tenth Circuit stated: "As long as the trooper's questioning did not extend the length of the detention, which has not been challenged by Defendant in this case, there is no Fourth Amendment issue with respect to the content of the questions."[59]

In this case, defendant argues that Trooper Dean extended the duration of the stop by asking questions unrelated to the traffic stop when he first approached the van.  Unlike the trooper in *Wallace*, he was not waiting for the results of license checks or other requests to the dispatcher.  Defendant asserts that when Trooper Dean expanded the scope of the stop by embarking on a "fishing trip," asking questions to explore the possibility of other criminal activity, he did not have reasonable suspicion, which constitutes a Fourth Amendment violation.

A review of the videotape recording the stop reveals that the questions that defendant challenges were asked after Trooper Dean approached the van and obtained license and registration, but before returning to his patrol car to ask the dispatcher to check license status and

---

[56]*Id.* at 971-73.

[57]*Id.* at 974.

[58]544 U.S. 93 (2005).

[59]*Wallace*, 429 F.3d at 974 (citing *United States v. Santos*, 403 F.3d 1120, 1132 n.6 (10th Cir. 2005)); *see also United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1253 (10th Cir. 2006) (reaffirming that under *Muehler* and *Wallace*, as long as an officer's questions does not appreciably extend the detention, the content of the questions is not subject to challenge under the Fourth Amendment); *United States v. Flores-Ocampo*, 173 Fed. App'x 688, 695 (10th Cir. 2006) (same).

criminal history.  The videotape indicates that the duration of the questioning was from 13:37:25 to 13:38:56 hours, or approximately ninety seconds.  Thus, the Court cannot conclude that Trooper Dean's questioning prolonged the traffic stop beyond the period necessary to issue a warning citation.  Nor was the duration of the stop unreasonable; the videotape indicates that defendant was detained approximately seven minutes before defendant was handed the warning citation., within the time period for a typical traffic stop.[60]

Even if Trooper Dean's questions briefly prolonged the detention, the Court is not persuaded that the questioning in this case was outside the scope of the stop.  It cannot be seriously contested that Trooper Dean's questions regarding defendant's travel itinerary, namely questions regarding where the Canos were coming from, where they were traveling to, and the purpose of the trip exceeded the scope of a permissible traffic stop.  In response to the trooper's inquiry about where they were coming from, defendant stated they had been to an automobile auction in Denver.  The trooper then asked where they were going, and defendant answered to Kentucky, to his dealership.   All of these questions were related to defendant's stated travel itinerary—that he was traveling from Denver where he had been to a car auction and returning to Kentucky, where he had a dealership.  In addition, the driver, Mrs. Cano, had an expired license and defendant had a California driver's license. In response to the trooper's question, defendant stated that he resided in Los Angeles.  Trooper Dean's question about where defendant lives is related to the information on defendant's driver's license, and also permissible.

### C.    Consent to Search

If an encounter between an officer and a driver ceases to be a detention and becomes

---

[60]*See United States v. Cline*, 349 F.3d 1276, 1288 (10th Cir. 2003) (noting that most traffic stops take between five and ten minutes).

consensual, and the driver voluntarily consents to additional questioning, no further Fourth

Amendment seizure or detention occurs.[61]  A traffic stop may become a consensual encounter,

requiring no reasonable suspicion, if the officer returns the license and registration and asks

questions without further constraining the driver by an overbearing show of authority.[62]  "A

consensual encounter is the voluntary cooperation of a private citizen in response to non-

coercive questioning by a law enforcement officer."[63]  "Whether an encounter can be deemed

consensual depends on whether the police conduct would have conveyed to a reasonable person

that he or she was not free to decline the officer's requests or otherwise terminate the

encounter."[64]  An officer is not required to inform a suspect that he does not have to respond to

his questioning or that he is free to leave.[65]  An unlawful detention occurs only when the driver

has an "objective reason to believe he or she is not free to end the conversation with the officer

and proceed on his or her own way."[66]

The Tenth Circuit follows "the bright-line rule that an encounter initiated by a traffic stop

may not be deemed consensual unless the driver's documents have been returned to him."[67]  The

return of a driver's documentation is not, however, always sufficient to demonstrate than an

---

[61]*United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005) (citing *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997)).

[62]*Id.* (citing *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000)).

[63]*Id.* (internal quotation omitted).

[64]*Id.* (internal quotation omitted).

[65]*Id.*

[66]*Id.* (internal quotation omitted).

[67]*Bradford*, 423 F.3d at 1158 (citing *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)), *overruled on other grounds by United States v. Botera-Ospina*, 71 F.3d, 783, 787 (10th Cir. 1995)).

encounter has become consensual.[68]  A routine traffic stop becomes a consensual encounter once the trooper has returned the driver's documentation so long as "'a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.'"[69]

Citing *Brown v. Illinois*,[70] defendant argues that the consent given was not voluntary for three reasons: (1) the short time between Trooper Dean ending the stop and asking for consent to search; (2) there were no intervening circumstances; and (3) Trooper Dean intentionally violated the Fourth Amendment by asking for consent to search with the apparent purpose of "fishing out" other possible illegal activity.  *Brown* is not applicable to this case, however, as defendant's consent was not given after an illegal stop.[71]  In this case, the Court has determined that the initial stop and extended detention were valid.

The Court finds upon the totality of the circumstances that a reasonable person would have felt free to leave or to refuse Trooper Dean's request to search after his paperwork was returned to him.  After Trooper Dean issued the warning and gave the Canos their documents back, he told them to "have a safe one," and stepped back from the van.  Defendant exited the van to switch seats with Mrs. Cano, at Trooper Dean's suggestion since she was driving with an

---

[68]*Id*. (citing *United States v. Elliott*, 107 F.3d 810, 813-14 (10th Cir. 1997)).

[69]*Id*. (quoting *United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir. 1993)).

[70]422 U.S. 590 (1975).

[71]*Id*. at 603-04 (explaining that to satisfy burden of showing that the primary taint of the illegal stop was purged so that the subsequent consent was voluntary in fact, the court must consider the temporal proximity of the illegal stop and consent, any intervening circumstances, and purpose and flagrancy of the official misconduct); *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir. 1994).

expired license.[72]   Trooper Dean then reinitiated contact with defendant and asked if he could ask

him a few questions, mentioned that there was a problem with drug and guns coming from

Denver, and asked if there were drugs or guns in the van.  The trooper then asked, "You mind if I

take a look?  Would that be okay?"  Defendant responded, "No. You can check."  It was broad

daylight on an interstate highway, and the trooper did not raise his voice or touch the van or

defendant.  Defendant was cooperative and immediately agreed to the search.  Having

considered the entire record, including the videotape of the stop, the Court finds that defendant's

consent to search was voluntary and uncoerced.

      **IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion to

Suppress (Doc. 11) is DENIED.

      IT IS SO ORDERED.

      Dated this  25th  day of August 2006.

                      S/ Julie A. Robinson
                     Julie A. Robinson
                     United States District Judge

---

[72]Trooper Dean did not issue a citation to Mrs. Cano for this infraction.